Stephanie WAGGONER,
Plaintiff–Appellant,

v.

OLIN CORPORATION, Defendant–
Appellee.

No. 98–2877.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 15, 1999.

Decided Feb. 26, 1999.

Samuel A. Mormino (argued), Alton, IL, for Plaintiff–Appellant.

Ronald K. Fisher (argued), Harris, Dowell, Fisher & Harris, Chesterfield, MO, Stephen W. Thomson, Thomson & Behr, Edwardsville, IL, for Defendant–Appellee.

Before POSNER, Chief Judge, and KANNE and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

The question before us is whether a disabled person with a record of erratic absences from work can be a "qualified individual with a disability" under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*

Stephanie Waggoner appeals from an order granting summary judgment, dismissing her ADA claim. Originally the district court had denied the Olin Corporation's motion for summary judgment. But after we issued our opinion in *Nowak v. St. Rita High School*, 142 F.3d 999 (7th Cir.1998), the court reconsidered and found that Waggoner was not a qualified individual with a disability because of her spotty attendance record.

Waggoner started working at the Olin Corporation's plant in East Alton, Illinois, on June 13, 1994, and held various jobs until she was discharged on February 22, 1996. At the time of her discharge she worked in a department with approximately 40 people. She was a production employee, covered by a collective bargaining agreement.

Waggoner suffered from "visual disturbances," sometimes referred to as seizures, though apparently there were none of the manifestations ordinarily associated with seizures. Olin conceded for purposes of the summary judgment motion that Waggoner's visual disturbances qualified as a "disability" for purposes of the ADA. During the course of her employment Waggoner was granted two medical leaves. The first, from January 9, 1995, to January 23, 1995, was for psoriasis. The second was related to her visual disturbances and lasted about 5½ months, from May 8 through October 17, 1995. She also missed work or was late for work 40 times during the 20 months she worked for Olin, which, if one subtracts the leaves, is a 14–month period. Olin's general practice is to discipline a worker who develops a pattern of attendance "occurrences" more frequent than one a month. Waggoner easily exceeded that number.

Waggoner's medical condition was not being successfully treated while she worked at Olin. During that time she saw Dr. Syed Ali, who was treating her with the drug Neurontin, but apparently the proper dosage was never determined and the drug did not eliminate the disturbances. After her 5½–month medical leave Waggoner claims that changes in her medical insurance plan required her to consult another physician, Dr. John Wuellner, who prescribed a different drug, Depakote. Again, the dosage was not fine-tuned at the time Waggoner was fired. Ultimately she returned to Dr. Ali, who apparently, after approximately 2 years, stabilized her condition.

Olin contends that Waggoner's disability had nothing to do with her termination; rather, her termination was due to her excessive erratic absences and other attendance "occurrences," such as being tardy and missing work without notifying anyone that she would be absent. Alternatively, Olin contends that Waggoner cannot be a "qualified individual" because she cannot perform the essential functions of the job. The rather common-sense idea is that if one is not able to be at work, one cannot be a qualified individual. Finally, Olin says, Waggoner did not request an accommodation—reasonable or not.

██ The issue we face is whether summary judgment was appropriate. For our *de novo* review of summary judgment, the case boils down to whether Waggoner is a qualified individual and whether, on the undisputed facts, it is reasonable to require Olin to let Waggoner miss work erratically, whenever necessary, and to pay someone else to do her job.

It should not require saying that generally attendance is a requirement of a job. Not surprisingly, courts are in agreement on this point. *See, e.g., Tyndall v. National Educ. Ctrs.*, 31 F.3d 209 (4th Cir.1994); *Rogers v. International Marine Terminals Inc.*, 87 F.3d 755 (5th Cir.1996); *Nesser v. Trans World Airlines, Inc.*, 160 F.3d 442 (8th Cir. 1998). We have said in *Nowak* that "an employee who does not come to work cannot perform the essential functions of his job." At 1003. Nowak was a teacher who had serious heart ailments and missed about a year and a half of work before he was terminated. He had made some attempts to return with accommodations, like a special parking place and a platform so he could sit down and teach, but he was unable, nevertheless, to remain at work. His termination was found not to violate the ADA.

We have also, however, upheld a jury verdict finding that a failure to accommodate reasonable requests for medical leave violates the ADA. *Haschmann v. Time Warner Entertainment Co.*, 151 F.3d 591 (7th Cir.1998). Connie Haschmann had worked at Time Warner in Rochester, New York, since 1991 and was doing well. She was promoted to vice-president of finance and transferred to the company's Green Bay Division in Green Bay, Wisconsin, on April 3, 1995. Almost immediately Haschmann did not please her boss in Green Bay, Kathy Keating. Haschmann had a flare-up of lupus in July of that year and went on medical leave on September 21. At this point, Keating had already decided to terminate Haschmann because of poor performance. For some reason, however, Haschmann was not terminated immediately, and she returned to work on October 9. Then on October 26 she had another relapse which required a second leave of absence. She was fired on Novem-ber 3. On the same day, Time Warner received a letter from Haschmann's attorney, saying Haschmann would be absent on medical leave for 2 to 4 weeks. We found that there was sufficient evidence to support the jury verdict that Haschmann was a qualified individual who sought a reasonable accommodation in the form of a short medical leave. But in saying that a company could be required to provide a medical leave, we also noted:

> [A] business needs its employees to be in regular attendance to function smoothly; the absence of employees is disruptive to any work environment. However, it is not the absence itself but rather the excessive frequency of an employee's absences in relation to that employee's job responsibilities that may lead to a finding that an employee is unable to perform the duties of his job. Consideration of the degree of excessiveness is a factual issue well suited to a jury determination.

At 602.

There are limits to how far an employer must go in granting medical leave. Surely the award for the most accommodating employer must go to the defendant in *Corder v. Lucent Technologies Inc.*, 162 F.3d 924 (7th Cir.1998). In that case we held that a woman who failed to show that "she was able to attend work reliably" had for that reason "failed to show that she was 'qualified'" for the job. Diana Corder had gone into a severe depression and missed an enormous amount of time from work. She had 43 weeks of paid sick leave in 1991; 19 weeks in 1992, and 9 weeks in 1993. Then, amazingly, in 1993 she requested that she have the winter holidays off. Lucent said no. Nevertheless, Corder left work ill on November 18 and refused to return until January 13, 1994. When she returned, she requested to be allowed to leave work 2 hours early each day. That request was denied, but she was allowed an unpaid leave of absence until a new branch office was opened nearer her home, thus cutting down the length of her commute, which seemed to be triggering panic attacks. But even after she began working at the new facility her trouble persisted; she missed 49 percent of her scheduled shifts.

484

Finally the company sought an independent medical evaluation to assess her ability to work. In various ways, she refused to cooperate. Lucent persisted in trying to determine whether Corder was able to work. At a conference in May 1995 Corder requested several accommodations, including "an 'unpredictable' amount of time off from work should her symptoms so demand." Then she took paid administrative leave and also one year of benefits under the company's Sickness & Accident Disability Plan. Finally, when she cut short another independent medical evaluation, she was fired. These facts, it should come as no surprise, easily led us to conclude that Corder was not a qualified individual with a disability under the ADA.

Compared to Corder, Waggoner might be said to look like a model employee. But the fact that Lucent Technologies had infinite patience does not necessarily mean that every company must put up with employees who do not come to work. Nor must every company hire replacements for absent employees and call that a reasonable accommodation. The issue before us is, when is enough, enough?

The purpose of the ADA is, of course, to prevent discrimination against persons with disabilities. Congress saw discrimination against disabled persons in society's tendency "to isolate and segregate individuals with disabilities." 42 U.S.C. § 12101(a)(2). Among the forms of discrimination prompting the enactment of the ADA were "outright intentional exclusion ... overprotective rules and policies ... exclusionary qualification standards and criteria ... [.]" § 12101(a)(5). The point was to ensure that persons with disabilities were not frozen out of society, which included employment for which they were otherwise qualified. They had to be allowed to compete for jobs and to hold jobs which they were able to perform with or without a reasonable accommodation.

■ The ADA, like the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq., which is to guide its enforcement, see § 12117, requires interpretation and line-drawing. It is clear, however, that to be a qualified person one must be "able to meet all of a program's requirements in spite of his handicap." Southeastern Community College v. Davis, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). To determine whether Waggoner is a "qualified individual" we must see whether she can perform the essential functions of the job and, if not, whether any reasonable accommodation would enable her to perform the job. § 12111(8); Corder; Tyndall; Chandler v. City of Dallas, 2 F.3d 1385 (5th Cir.1993). The burden is on Waggoner to show that she can meet these requirements. Corder; Lucero v. Hart, 915 F.2d 1367 (9th Cir.1990).

■ Rather than attempting to show that she is a qualified individual, however, Waggoner seems to want to turn the ADA on its head. It is as if she thinks that rather than ensuring that she be allowed to work, the ADA requires Olin to provide her with a job but not require that she regularly perform it. Rather, Olin must hire another employee to do the job for her while she remains a full-time employee. The Act does not go so far. The ADA protects an important, but finite, universe of people. For instance, it does not protect everyone with an impairment. The impairment must be found to limit a major life activity. See § 12102(2). The Act does not protect people, for instance, from being fired because of illness. Christian v. St. Anthony Med. Ctr., 117 F.3d 1051 (7th Cir.1997), cert. denied, —— U.S. ——, 118 S.Ct. 1304, 140 L.Ed.2d 469 (1998). Persons are not disabled who are unable to perform only a narrow range of jobs. Bridges v. City of Bossier, 92 F.3d 329 (5th Cir.1996). Disability does not include temporary medical conditions. Harrington v. Rice Lake Weighing Sys., Inc., 122 F.3d 456 (7th Cir.1997); Halperin v. Abacus Tech. Corp., 128 F.3d 191 (4th Cir.1997).

■ We think it also fair to conclude that in most instances the ADA does not protect persons who have erratic, unexplained absences, even when those absences are a result of a disability. The fact is that in most cases, attendance at the job site is a basic requirement of most jobs. As the Tyndall court put it:

[A]n evaluation of the quality of Tyndall's performance does not end our inquiry. In addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate these skills by coming to work on a regular basis. Except in the unusual case where an employee can effectively perform all work-related duties at home, an employee "who does not come to work cannot perform *any* of his job functions, essential or otherwise." [Citation omitted.]

At 213. The Court of Appeals for the Eleventh Circuit has said that an employee with a history of sporadic unpredictable absences is not otherwise qualified. *Jackson v. Veterans Admin.*, 22 F.3d 277 (11th Cir.1994), *cert. denied*, 513 U.S. 1052, 115 S.Ct. 657, 130 L.Ed.2d 560 (1994). Similarly, to repeat a second time what we said in *Nowak*, "an employee who does not come to work cannot perform the essential functions of his job." At 1003.

■ We are not establishing a hard-and-fast rule that no absences from work need be tolerated. We have indicated our willingness to look to the reasonableness of an accommodation of a requested medical leave. *Haschmann*. In some cases, even working part-time is an accommodation which can and often should be made. In some jobs—though almost certainly not in production jobs such as Waggoner's—working at home for a time might be an option. However, in evaluating any requested accommodation, the issue will be whether the hardship imposed on the employer by it is "undue." § 12111(10).

But in this case Waggoner has not, except in the most offhand way through the comments of her union representative, even made a genuine request for a reasonable accommodation. During her discharge hearing, the following exchange occurred between the union representative, Greg Beckham, and Olin's labor relations representative, Terry Sitze:

Sitze: What do you think your rights under ADA are? What accommodations should you receive by the Company?

. . . .

Beckham: Maybe a reduced work week or a day off if she needs it.

Sitze: This is very important, Greg. Please tell me.

Beckham: Reduced schedule or time off if it is related to the same thing.

. . . .

Sitze: If she has a seizure once a week, that's excusable?

Beckham: Yes.

Sitze: If she has two a month and is off, that's 24 days a year. And that's OK?

Beckham: If it's seizure related. Don't think you should fire them as long as they continue to document.

This sort of request is one of which we have previously indicated our rejection. We said in *Haschmann* that a business "was not obligated to tolerate erratic, unreliable attendance or to provide an accommodation which would impose an undue hardship on the business." At 601. Waggoner did not indicate that she was requesting a leave so that she would have time to refine the dosage of her medication so that she could return to work on a regular basis. All she said on the subject at her discharge hearing was, "I just want to know if I'm employed here or not." She simply wanted to miss work whenever she felt she needed to and apparently for so long as she felt she needed to. As a matter of law, that request in this context was not reasonable, and accordingly the judgment of the district court is AFFIRMED.